# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF ALABAMA
# SOUTHERN DIVISION

| | |
|---|---|
| ALLISON WARREN, *et al.*,      ) | |
| ) | |
| Plaintiffs,      ) | |
| ) | |
| v.      ) | CIVIL ACTION 15-0603-WS-M |
| ) | |
| COOK SALES, INC., *et al.*,      ) | |
| ) | |
| Defendants.      ) | |

**ORDER**

This matter comes before the Court on plaintiffs' Consent Motion for Final Order Approving Settlement of Collective Action and Dismissing Case (doc. 57).[1] A final fairness hearing was conducted in this matter on January 18, 2017, with all parties and potential opt-in plaintiffs being given advance written notice of the time, date and location of such hearing. No written objections to the proposed settlement were submitted in advance of the hearing, nor were any objections articulated by any party or potential opt-in plaintiff at the fairness hearing. The Consent Motion is now ripe for disposition.

**I.      Procedural Background.**

Plaintiffs Allison Warren, Chester Dampier, Sherri Mullinax and Evelyn Clem (collectively, the "Named Plaintiffs") brought this action seeking unpaid overtime compensation under the Fair Labor Standards Act, 29 U.S.C. §§ 201 *et seq.* ("FLSA"), against defendants, Cook Sales, Inc. and Cook Portable Warehouses of Mississippi, LLC. The Complaint (doc. 1) alleged that plaintiffs were employed by defendants as sales representatives and/or lot managers, that they routinely worked more than 40 hours per week, and that defendants failed to pay them overtime pay of one and one-half times their regular rates of pay for hours worked in excess of 40, as required by the FLSA. Plaintiffs brought their Complaint as a putative FLSA collective

---

[1]      The Court understands that plaintiffs filed this Consent Motion pursuant to a compromise settlement they negotiated with defendants. The Court further understands that defendants object to neither the Consent Motion nor the form and contents of this Order.

action, on their own behalf and on behalf of all other similarly-situated sales representatives, pursuant to 29 U.S.C. § 216(b).  On January 28, 2016, plaintiffs filed a Notice of Filing Consents to Join Suit (doc. 15) reflecting that Gladys Swain, Charlotte Smith, Amanda Mathis and Shannon Rose (collectively, the "Original Opt-In Plaintiffs") had executed consent forms and sought to join this action as parties plaintiff.

For its part, Cook Sales vigorously disputed plaintiffs' theory of liability and denied that the challenged compensation practices and policies were violative of the FLSA.  Most notably, Cook Sales maintained that plaintiffs' claims were defeated by the retail and service establishment exemption found at Section 7(i) of the FLSA.[2]  Among its other defenses and arguments against liability, Cook Sales asserted that its conduct was not willful, such that the FLSA's two-year limitations period, rather than the three-year alternative, should apply; and objected that this case was ill-suited for treatment as a collective action because the Named Plaintiffs and putative opt-ins were not similarly situated.  (*See* doc. 9.)

On March 9, 2016, while plaintiffs' Motion for Conditional Certification (doc. 14) was pending, the parties jointly requested that these proceedings be stayed pending the outcome of mediation.  (Doc. 31.)  To facilitate their negotiations, the parties entered into a Tolling Agreement (doc. 34) that would toll the running of the statute of limitations as of December 22, 2015, for the claims of sales representatives in the putative class.  The Court granted the joint motion to stay via Order (doc. 33) entered on March 10, 2016.  In the ensuing five months, the parties worked diligently together and with mediator Fern Singer to forge an agreement that would resolve this matter in its entirety.  They have now achieved that objective, subject to judicial approval.

To effectuate the parties' mediated settlement, the undersigned entered an Order (doc. 52) on August 25, 2016.  That Order made the following rulings, among others: (i) it certified for settlement purposes a class consisting of all sales representatives employed by Cook Sales from

---

[2] That exemption provides that an employer does not violate the FLSA's overtime requirements by employing an employee of a retail or service establishment for more than 40 hours per workweek if "(1) the regular rate of pay of such employee is in excess of one and one-half times the minimum hourly rate applicable to him under section 206 of this title, and (2) more than half his compensation for a representative period (not less than one month) represents commissions on goods or services."  29 U.S.C. § 207(i).

December 22, 2012 through December 22, 2015 (the "Potential Opt-In Plaintiffs"); (ii) it approved the parties' proposed form Notice of Settlement (doc. 51, Exh. 3) and authorized distribution of that Notice to Potential Opt-In Plaintiffs; (iii) it appointed Simpluris Class Action Settlement Administration as the Settlement Claims Administrator; (iv) it prescribed specific procedures for dissemination of the Notice of Settlement to Potential Opt-In Plaintiffs, and made allowances for objections to the proposed settlement; and (v) it set this matter for a final fairness hearing on January 18, 2017.

In their Consent Motion for Final Order Approving Settlement, plaintiffs provide a detailed evidentiary submission documenting the settlement notice and administration process that has been implemented in the wake of the August 25 Order. Plaintiffs show that the Settlement Claims Administrator processed and updated the mailing addresses received from Cook Sales for all 168 Potential Opt-In Plaintiffs, then mailed notice and claims forms to such individuals on September 23, 2016. (Francisco Decl. (doc. 59), ¶¶ 6-8.) Some 15 notices were re-mailed by the Settlement Claims Administrator either because the original notices were returned as undeliverable or the Administrator otherwise learned of an updated forwarding address for a potential opt-in plaintiff. (*Id.*, ¶ 9.)[3] On October 24, 2016, the Settlement Claims Administrator mailed reminder notices to 123 Potential Opt-In Plaintiffs who had not responded to the initial mailing by submitting a claim form. (*Id.*, ¶ 10.) Cook Sales notified the Settlement Claims Administrator on November 18, 2016 that it had identified three additional Potential Opt-In Plaintiffs whose names had been inadvertently omitted from the list of class members provided previously. (*Id.*, ¶ 11.) The Settlement Claims Administrator mailed class notices to those three potential opt-ins on November 21, 2016, reciting a deadline of January 20, 2017 (*i.e.*, the full 60-day period allowed for all other Potential Opt-In Plaintiffs) for them to file claims or object to the settlement. (*Id.*)[4]

---

[3] Ultimately, the Settlement Claims Administrator was left with only three Potential Opt-In Plaintiffs for whom notices were returned as undeliverable and no alternate deliverable addresses were identified. (*Id.*)

[4] The court file reflects that two of those three late-identified class members timely filed claims. (*Id.*) The third did not; however, the Settlement Claims Administrator left a message informing that person of the January 18 fairness hearing. (*Id.*) This third late-identified individual neither appeared at the hearing nor filed a claim or objection on or before the January 20 deadline fixed by the relevant notice documents.

All told, the Settlement Claims Administrator received timely consent to join forms from 61 Potential Opt-In Plaintiffs, or 35.7% of the total 171 potential class members identified by Cook Sales during the settlement administration process. (Francisco Decl., ¶¶ 12, 13.)[5] To those 61 Potential Opt-In Plaintiffs who elected to join the settlement of this action, we must also add the four Named Plaintiffs and the four Original-Opt In Plaintiffs, such that the total number of plaintiffs participating in this settlement is 69, or 38.5% of the 179 individuals who were eligible to join in this litigation. (Smith Supp. Decl. (doc. 58), ¶ 4.)

Class notice forms expressly informed Potential Opt-In Plaintiffs of their right to object to the settlement as unfair. (Francisco Decl., ¶ 5 & Exh. A.) The notice instructed Potential Opt-In Plaintiffs to mail any objections to the Settlement Claims Administrator at the address provided, with the directive that "[y]our objection must be received by the Settlement Claims Administrator by November 22, 2016." (*Id.*) At no time did the Settlement Claims Administrator receive any objections to the proposed settlement. (Francisco Decl., ¶ 14; Smith Supp. Decl., ¶ 6.) Indeed, plaintiffs' counsel reports that all Potential Opt-In Plaintiffs who contacted plaintiffs' counsel during the notice and claims period "expressed support for the Settlement." (Smith Supp. Decl., ¶ 6.) Moreover, all Potential Opt-In Plaintiffs were given written notice of the date, time and location of the fairness hearing conducted before the undersigned on January 18, 2017, as well as their right to appear; however, no Potential Opt-In Plaintiffs attended, much less articulated any objections at, that hearing.

**II.     Settlement Terms.**

By the terms of the parties' Release and Settlement Agreement (doc. 51, Exh. 2), Cook Sales shall pay the sum of $495,000.00 into a common fund, referred to as the "Gross Fund," to

---

[5]     A 62nd consent to join notice was submitted by James Dykes on behalf of his deceased wife, Virginia Dykes, who was a Potential Opt-In Plaintiff. (Doc. 55, Exh. 1; Smith Supp. Decl. (doc. 58), ¶ 3.) The Settlement Claims Administrator determined that the Dykes claim form was submitted outside the requisite 60-day claims period, rendering it untimely, and notified Mr. Dykes that the claim was not approved for that reason. (*Id.*) The Court understands that Mr. Dykes subsequently requested that his claim form be withdrawn, and that plaintiffs filed a Notice of Withdrawal of Claim Form (doc. 56) on that basis. In light of these circumstances (both the untimeliness of the claim and the claimant's voluntary withdrawal of same), the Dykes claim form will not be accepted or considered as part of the settlement in this action, and neither Virginia Dykes nor her husband will be treated as an opt-in plaintiff or will be eligible to receive a share of the settlement proceeds in this action.

settle the claims of the Named Plaintiffs, Original Opt-In Plaintiffs, and Potential Opt-In Plaintiffs who submitted consent to join forms in a timely manner. (*Id.* at ¶ 4.) The parties have agreed that, subject to court approval, the Gross Fund will also be used to pay attorney's fees, litigation costs and expenses of plaintiffs' counsel in an amount not to exceed $148,500.00, or 30% of the Gross Fund. (*Id.* at ¶ 4.a.)[6] The Settlement Agreement also provides that the Gross Fund will be used to furnish each of the four Named Plaintiffs and each of the four Original Opt-In Plaintiffs with a "service payment" of $5,000, for an aggregate of $40,000. (*Id.* at ¶ 4.b.)[7] And the Settlement Agreement provides that the Gross Fund will be used to pay all costs, fees and expenses of the Settlement Claims Administrator, not to exceed $15,000. (*Id.* at ¶ 4.c.)

Pursuant to the Settlement Agreement, the Gross Fund less plaintiffs' attorney's fees, costs and litigation expenses; the Settlement Claims Administrator's fees, costs and expenses; and the service payments to Named Plaintiffs and Original Opt-In Plaintiffs, is referred to as the "Net Fund." (*Id.* at ¶ 4.d.) The parties have agreed that the Net Fund will be used to fund back pay and liquidated damages payments to Named Plaintiffs, Original Opt-In Plaintiffs, and the 61 Potential Opt-In Plaintiffs who timely submitted consent to join forms (the "Opt-In Plaintiffs"). Settlement payments to the Opt-In Plaintiffs will be drawn from the Net Fund in accordance with a formula based on the number of weeks each employee is reported to have worked for defendants during a designated three-year period from December 2012 through December 2015. (*Id.* at ¶ 8.)[8] Payments to Opt-In Plaintiffs will be allocated evenly between back pay and

---

[6]  Notably, the Settlement Agreement neither mandates that plaintiffs' counsel be compensated in the amount of $148,500 nor conditions the settlement on judicial approval of plaintiffs' counsel's fees, costs and expenses in any particular sum. (*Id.* at ¶ 4.f.)

[7]  The service payments are designed to provide compensation for these individuals' efforts in the investigation of this litigation, their participation in discovery, and their preparation for and attendance at mediation, all for the benefit of themselves and the Potential Opt-In Plaintiffs who participate in the settlement.

[8]  The parties' expectation is that the formula will yield payments to Opt-In Plaintiffs of approximately $47.00 per week, which plaintiffs' counsel believes – based on extensive modeling – to be "very close to" the damages to which these individuals would otherwise have been entitled for working 45 minutes off the clock per day throughout their employment as sales representatives for Cook Sales. (Smith Decl. (doc. 51), ¶ 26; Smith Supp. Decl., ¶ 5.) The weekly damages amount calculated through the formula for Opt-In Plaintiffs is comparable to the approximately $45.00 per week in damages payments allocated to Named
(Continued)

liquidated damages. According to the Settlement Agreement, "[t]he amounts allocated to [Opt-In Plaintiffs] pursuant to this formula shall revert to Defendants for any Potential Opt-Ins who fail to timely file a claim form." (*Id.*)

With respect to Named Plaintiffs and Original Opt-In Plaintiffs, the Settlement Agreement fixes payments from the Net Fund in the following amounts, inclusive of back pay and liquidated damages (and in lieu of the formula utilized in computing settlement payments to the 61 Opt-In Plaintiffs):

| | |
|---|---|
| Evelyn Clem | $1,955.53 |
| Chester Dampier | $2,672.56 |
| Amanda Mathis | $987.88 |
| Sherri Mullinax | $2,084.45 |
| Shannon Rose | $832.98 |
| Charley Smith | $1,770.11 |
| Gladys Swain | $2,361.97 |
| Allison Warren | $2,888.16 |

Cook Sales will pay the employer's portion of all taxes due on the back pay awards to Named Plaintiffs, Original Opt-In Plaintiffs, and Opt-In Plaintiffs.

Filings in support of the settlement confirm that plaintiffs are requesting payouts from the $495,000 Gross Fund in the amounts of $148,500 for attorney's fees and litigation costs, $10,168 for settlement administration costs, and $40,000 in service payments to the Named Plaintiffs and Original Opt-In Plaintiffs. (Francisco Decl., ¶ 13.) If all of those deductions are approved by this Court, then there would be a remaining Net Fund of $296,332 (or $495,000 - $148,500 - $10,168 - $40,000) from which to allocate settlement payments of back pay and liquidated damages to the Named Plaintiffs, Original Opt-In Plaintiffs, and Opt-In Plaintiffs. (Smith Supp. Decl., ¶ 4; Francisco Decl., ¶ 13.) The agreed-upon fixed payments to Named Plaintiffs and Original Opt-In Plaintiffs, as enumerated *supra*, total $15,553.64. Additionally, the Settlement Claims Administrator calculates the payments owed to the 61 Opt-In Plaintiffs via the agreed-

---

Plaintiffs and Original Opt-In Plaintiffs as fixed sums in the Settlement Agreement. (Smith Supp. Decl., ¶ 5.) The point is that, in terms of weekly damages awards, the settlement results in payments of similar magnitude (on a per-week basis for the weeks each individual worked at Cook Sales during the relevant time period) to Named Plaintiffs, Original Opt-In Plaintiffs, and Opt-In Plaintiffs. Each category of claimant is treated similarly.

upon formula as totaling $131,405.34. (Francisco Decl., ¶ 13.)[9]  Assuming the accuracy of these calculations, then, the total draw on the Net Fund for payments to Named Plaintiffs, Original Opt-In Plaintiffs, and Opt-In Plaintiffs will be $146,958.98.  That leaves an unclaimed, unallocated balance in the Net Fund of $149,373.02 (or $296,332 - $146,958.98).  By the terms of the Settlement Agreement, that amount will revert to defendants.  In sum, of the $495,000 gross settlement amount, the parties contemplate that $148,500 (30%) will go to plaintiffs' attorney's fees and litigation expenses; $10,168 (2%) will go to settlement administration costs; $40,000 (8%) will be paid out as service payments to representative plaintiffs; $146,958.98 (a shade below 30%) will be paid out as damages payments to plaintiffs and opt-ins; and $149,373.02 (slightly above 30%) will revert to defendants.

**III.     Analysis of Settlement.**

     *A.     Necessity of Judicial Approval.*

In the overwhelming majority of civil actions brought in federal court, settlements are not subject to judicial scrutiny or approval.  However, FLSA settlements must be handled differently.  *See, e.g., Moreno v. Regions Bank*, 729 F. Supp.2d 1346, 1348 (M.D. Fla. 2010) ("Settlement of an action under the FLSA stands distinctly outside the practice common to, and accepted in, other civil actions.").  This is because "Congress made the FLSA's provisions mandatory; thus, the provisions are not subject to negotiation or bargaining between employers and employees."  *Lynn's Food Stores, Inc. v. United States*, 679 F.2d 1350, 1352 (11th Cir. 1982).  "Despite this general rule, an employer and an employee may settle a private FLSA suit under the supervision of the district court" where there is a "bona fide dispute over FLSA coverage."  *Hogan v. Allstate Beverage Co.*, 821 F. Supp.2d 1274, 1281 (M.D. Ala. 2011).  The mechanics of such a settlement are that "[w]hen employees bring a private action for back wages under the FLSA, and present to the district court a proposed settlement, the district court may enter a stipulated judgment after scrutinizing the settlement for fairness."  *Lynn's Food*, 679 F.2d at 1353.

---

[9] The Court notes that these calculations suggest a mean payment to the 61 Opt-In Plaintiffs of $2,154.18.  Also, plaintiffs' evidence is that the largest settlement payment to a single Opt-In Plaintiff using the formula will be $7,337.74.  (*Id.*)

Where, as here, a district court is asked to approve an FLSA settlement between private litigants, the court's responsibility is to ascertain whether the parties' negotiated resolution comports with the statute's terms. *See, e.g., Nall v. Mal-Motels, Inc.*, 723 F.3d 1304, 1307-08 (11th Cir. 2013) ("[t]he purposes of the FLSA are undermined whenever an employer is allowed to escape liability for violations of the statute"); *Miles v. Ruby Tuesday, Inc.*, 799 F. Supp.2d 618, 622-23 (E.D. Va. 2011) ("the reason judicial approval is required for FLSA settlements is to ensure that a settlement of an FLSA claim does not undermine the statute's terms or purposes"). A settlement may be approved when the court confirms that "employees have received all uncontested wages due and that they have received a fair deal regarding any additional amount that remains in controversy." *Hogan*, 821 F. Supp.2d at 1282. Thus, the touchstone of the inquiry is whether the proposed settlement "constitutes a fair and reasonable compromise of a *bona fide* FLSA dispute." *Crabtree v. Volkert, Inc.*, 2013 WL 593500, *3 (S.D. Ala. Feb. 14, 2013).

An important caveat to this mandatory judicial oversight is that "[i]n reviewing FLSA settlements under *Lynn's Food*, courts should be mindful of the strong presumption in favor of finding a settlement fair." *Parker v. Chuck Stevens Chevrolet of Atmore, Inc.,* 2013 WL 3818886, *2 (S.D. Ala. July 23, 2013) (citations and internal quotation marks omitted); *see also Wingrove v. D.A. Technologies, Inc.*, 2011 WL 7307626, *2 (N.D. Ga. Feb. 11, 2011) (recognizing "strong presumption" that FLSA settlements are fair and reasonable). Such deference is warranted because "the Court is generally not in as good a position as the parties to determine the reasonableness of an FLSA settlement" and "[i]f the parties are represented by competent counsel in an adversary context, the settlement they reach will, almost by definition, be reasonable." *Bonetti v. Embarq Management Co.*, 715 F. Supp.2d 1222, 1227 (M.D. Fla. 2009).

      B.    *Fairness/Reasonableness of Payments to Plaintiffs.*

All information before the Court reflects that this action does, indeed, involve a *bona fide* dispute over FLSA coverage. Whereas plaintiffs' position was that Cook Sales had failed to pay overtime wages to its sales representatives under the FLSA, defendants countered that, among other things, the sales representatives were exempt from the FLSA's overtime compensation requirements pursuant to the statute's retail and service establishment exemption (the so-called "Section 7(i) exemption"). Had this action proceeded to trial, Cook Sales would have argued

that (and the finder of fact would have had to decide whether) its commission plan was a *bona fide* plan under the FLSA because many sales representatives regularly received substantial commission payments. (Smith Decl. (doc. 51), ¶ 23.) For their part, plaintiffs would have contended that Cook Sales' commission plan was not a *bona fide* plan because a subset of the sales representatives earned insufficient commissions. The Section 7(i) exemption was very much in play in this action, and plaintiffs were keenly aware that it potentially could have derailed their FLSA claims altogether. (*Id.*) Another hurdle confronting plaintiffs had this action gone to trial was that Cook Sales' contemporaneous time records reflected that plaintiffs did not work overtime. (*Id.*, ¶ 24.) Had Cook Sales been able to persuade the finder of fact that its time records were, in fact, valid and accurate, then plaintiffs' FLSA claims would have been dealt a staggering blow. For these and other reasons, the Court readily determines that plaintiffs' FLSA claims were actually, reasonably in dispute, thereby giving rise to the propriety of a *Lynn's Food* compromise settlement of those disputed claims.

Against this backdrop of substantial litigation uncertainty and the real risk of plaintiffs coming away empty-handed at trial, the parties negotiated a settlement to resolve the FLSA claims of the four Named Plaintiffs, the four Original Opt-In Plaintiffs, and the 61 Opt-In Plaintiffs. This settlement was reached only after "a vigorous debate with respect to coverage and amounts due under the FLSA and comprehensive vetting of the wage practices at issue." (Smith Decl., ¶ 19.) By plaintiffs' counsel's reckoning, the crux of plaintiffs' FLSA claims was that Cook Sales had failed to pay them for approximately 45 minutes of unrecorded time per day. (*Id.*, ¶¶ 24, 26.) The settlement contemplates that each plaintiff and opt-in plaintiff will receive a cash payment of roughly $45 to $47 per week of employment at Cook Sales during the requisite three-year period. (Smith Supp. Decl., ¶ 5.) The effect, then, is that each plaintiff and opt-in plaintiff receives an amount "very close to the damages that Plaintiffs' counsel calculated are due." (Smith Decl., ¶ 26; doc. 57, at 13.)[10] To be clear, this settlement does not represent a

---

[10] Plaintiffs do not delineate whether their figures for "damages that Plaintiffs' counsel calculated are due" incorporate what would be "due" for both back pay and liquidated damages. It appears, however, that liquidated damages are not fully provided in those "damages due" figures. After all, plaintiffs' counsel estimate that a 100-cents-on-the-dollar recovery for all Named Plaintiffs, Original Opt-In Plaintiffs, and Potential Opt-In Plaintiffs, inclusive of back pay damages and liquidated damages for a three-year period, would have been $540,000. (Smith Decl., ¶ 25.) But only 69 of the total 179 eligible sales representatives (or 38.5%) are
(Continued)

recovery of 100 cents on the dollar for all participating plaintiffs. But it is in the ballpark. Furthermore, it provides damages payments to plaintiffs for a three-year period, which would be achievable at trial only if plaintiffs succeeded in proving both that Cook Sales violated the FLSA and that its violations were willful, which is far from a sure thing.

What the parties have reached, then, is a classic compromise. Plaintiffs accepted less money in settlement than they would have received if they had prevailed on all matters at trial, in exchange for the certainty of receiving payment now without the burden of litigating Cook Sales' multiple colorable defenses that, if successful, could have reduced or even negated plaintiffs' recovery. After careful examination of the Consent Motion for Final Order Approving Settlement, the supporting documentation presented contemporaneously therewith, all other relevant materials in the court file, and the arguments presented at the January 18 fairness hearing, the Court concludes that the parties' proposed damages payouts to plaintiffs and opt-ins represent a fair and reasonable compromise of a *bona fide* FLSA dispute.

Numerous considerations support and inform that determination. First, as noted, the result of the settlement is that each participating plaintiff will receive an amount "very close" to the amount calculated in damage modeling as being due, with such amounts to cover a three-year period reserved for "willful" violations. Second, both sides are represented by competent, experienced counsel well-versed in this area of the law. Third, the parties have shown that this settlement was the product of arm's-length, good-faith, hard-fought negotiations conducted with the assistance of an experienced class action mediator after exchange of discovery materials that allowed each side to develop an informed factual basis for evaluating the strengths and weaknesses of their respective arguments, both as to the merits and for their divergent damages calculations. Fourth, the Court concurs that plaintiffs confronted substantial risk factors that

---

participating in this settlement. If those 69 participating plaintiffs were receiving a 100-cents-on-the-dollar recovery that included full liquidated damages, their recovery from the Net Fund should be approximately $207,900 (or $540,000 x .385). In fact, as discussed above, the total payout to participating plaintiffs from the Net Fund is substantially lower, $146,958.58. It appears, then, that when plaintiffs' counsel indicates that the settlement payment of roughly $45 per week per plaintiff "is very close to the damages that Plaintiffs' counsel calculated are due" (Smith Decl., ¶ 26), they mean that the settlement payment is very close to the back wages that would have been due for plaintiffs working 45 minutes of unrecorded, uncompensated time per day throughout the three-year period had they been deemed nonexempt at trial.

might have jeopardized or curtailed their ability to prevail at trial.  Fifth, in the absence of a settlement, this action would in all likelihood have proceeded down the same drawn-out, adversarial path on which it had previously embarked, resulting in considerable expense for all parties to litigate the matter to conclusion, considerable delay for plaintiffs to capture any recovery, and only limited upside for a greater overall monetary award at the end of the day.  Sixth, the terms of the settlement have been described in some detail to the Named Plaintiffs, Original Opt-In Plaintiffs, and Opt-In Plaintiffs, yet none of them have objected or articulated concerns about the reasonableness of the settlement.  And seventh, the settlement appears equitable in its treatment of different classes of plaintiffs (*i.e.*, Named Plaintiffs, Original Opt-In Plaintiffs, and Opt-In Plaintiffs), with all of them receiving comparable damages payments on a per-week basis.

### C.   *Administration Expenses, Service Payments and Attorney's Fees.*

Three other aspects of the negotiated settlement bear examination as part of the judicial approval process.  In particular, the parties' proposed compromise would result in the Settlement Claims Administrator receiving $10,168; the four Named Plaintiffs and four Original Opt-In Plaintiffs receiving service payments of $5,000 apiece; and plaintiffs' counsel receiving an attorney's fee award of $148,500, with all such amounts being drawn from the common settlement fund.  The Court will address each category in turn.

#### 1.   *Payment of Expenses to Settlement Claims Administrator.*

In one provision of their Settlement Agreement, the parties agreed "that all costs, fees, and expenses of the Settlement Claims Administrator, not to exceed $15,000, will be paid from the Gross Fund." (Smith Decl., Exh. 2, ¶ 4.c.)  In their settlement documentation, plaintiffs show that the court-appointed administrator, Simpluris, Inc., has provided and will continue to provide extensive services in administering the settlement.  Indeed, the record reflects that Simpluris received a mailing list of more than 160 Potential Opt-In Plaintiffs, processed and updated the mailing addresses therein using available databases, printed and mailed notice packets to all Potential Opt-In Plaintiffs, received notice packets returned as undeliverable, conducted research to endeavor to locate forwarding addresses for those undeliverable notices, received and validated claims forms, mailed reminder postcards to Potential Opt-In Plaintiffs who did not promptly submit claims forms, fielded inquiries from Potential Opt-In Plaintiffs via a toll-free hotline established by Simpluris, calculated payment amounts, and prepared exhibits for

plaintiffs' use in connection with the Consent Motion. (Francisco Decl., ¶¶ 3, 6-13.) The record further shows that if the settlement is approved by this Court, Simpluris will continue to provide settlement administration services in this action by calculating and issuing individual settlement checks, distributing funds, performing the necessary tax reporting on such payments, fielding telephonic inquiries from participating plaintiffs, and so on. (*Id.*, ¶¶ 3, 17.)

As compensation for these settlement administration services (including both work performed to date and anticipated future activities), Simpluris seeks payment of $10,168 from the Gross Fund. (*Id.*, ¶ 17.) Not only does this fee appear facially reasonable given the services performed by Simpluris in administering the settlement in this case, but the requested payment comes in substantially below the $15,000 estimate to which the parties stipulated in the Settlement Agreement. For these reasons, the proposed payment of $10,168 to Simpluris out of the Gross Fund is **approved** as fair and reasonable.

        2.       *Payment of Service Payments to Representative Plaintiffs.*

Another term of the Settlement Agreement is that "each of the Named Plaintiffs and Original Opt-Ins shall be paid a service payment of $5,000 from the Gross Fund for an aggregate total of $40,000.00." (Smith Decl., Exh. 2, ¶ 4.b.) Plaintiffs explain that the purpose of awarding such incentive payments is to recognize these individuals' extensive efforts in this litigation, which include assisting with the investigation, participating in discovery including court interrogatories, preparing for and attending mediation, consulting with plaintiffs' counsel in determining a fair settlement fund, and other contributions for their own benefit and for the Potential Opt-In Plaintiffs. (Smith Decl., ¶ 28.)

"[T]here is ample precedent for awarding incentive compensation to class representatives at the conclusion of a successful class action. … Courts have consistently found service awards to be an efficient and productive way to encourage members of a class to become class representatives." *In re Checking Account Overdraft Litigation*, 830 F. Supp.2d 1330, 1357 (S.D. Fla. 2011) (citations and internal quotation marks omitted); *see also In re Domestic Air Transp. Antitrust Litigation*, 148 F.R.D. 297, 358 (N.D. Ga. 1993) ("The Court finds that incentive awards are appropriate to recognize the efforts of the representative plaintiffs to obtain recovery for the class. Modest compensation may sometimes be merited for extra time spent by the class representatives in meeting with class members, gathering discovery materials on behalf of the class, and similar efforts.") (citation and internal quotation marks omitted); *Faught v. American*

*Home Shield Corp.*, 2010 WL 10959223, *11 (N.D. Ala. Apr. 27, 2010) ("Requests for incentive payments to named class representatives are fairly customary. These payments are intended to recognize the time and efforts a class representative spends on behalf of the class."). In determining whether a requested service award is appropriate, courts consider such factors as "(1) the actions the class representatives took to protect the interests of the class; (2) the degree to which the class benefited from those actions; and (3) the amount of time and effort the class representatives expended in pursuing the litigation." *In re Checking Account*, 830 F. Supp.2d at 1357.

Plaintiffs have made a substantial showing of the actions taken by the Named Plaintiffs and Original Opt-In Plaintiffs to advance this litigation and to protect and promote the interests of Potential Opt-In Plaintiffs. On that basis, the Court concludes that the modest service payments proposed by the parties are appropriate and reasonable. Moreover, those service payments do not have the effect of reducing the damages awards to any plaintiff participating in the settlement, and no objections to these proposed payments have been submitted. For all of these reasons, the proposed incentive awards to each of the Named Plaintiffs and Original Opt-In Plaintiffs in the amount of $5,000 (or $40,000 in total) from the Gross Fund are **approved** as fair and reasonable.

        3.     *Attorney's Fees.*

In their Settlement Agreement, the parties agreed that "thirty percent (30%) of the Gross Fund will be allocated to the payment of Plaintiffs' attorneys' fees, litigation costs and expenses. Defendants agree to not oppose a request by Plaintiffs' counsel of up to $148,500.00 for attorneys' fees, litigation costs and expenses." (Smith Decl., Exh. 2, ¶ 4.a.) Plaintiffs' counsel now seek the full measure of that proposed award of 30% of the Gross Fund by requesting an award of attorney's fees, expenses and litigation costs in the amount of $148,500. (Smith Decl., ¶¶ 29-30.)

As a threshold matter, it may not be necessary to adjudicate the reasonableness of plaintiffs' attorney's fees paid by defendants in this FLSA settlement. Although the parties negotiated a global settlement inclusive of back pay, liquidated damages, administration costs, service payments and attorney's fees, the Court does not find – and has no reason to believe – that the fee portion of the settlement has been at the expense of statutory compensation owed to participating plaintiffs. Even if, for example, plaintiffs' counsel were awarded $50,000 more or

$50,000 less in attorney's fees, under the terms of the Settlement Agreement such shifts would not affect the recovery of any participating plaintiff one whit.[11] In other words, the proposed settlement described in the Consent Motion is not a zero-sum game in which each settlement dollar allocated to plaintiffs' lawyers results in a dollar of FLSA compensation being taken from plaintiffs' pockets. While attorney's fee settlements in FLSA cases may be problematic for *Lynn's Food* analysis where the fee award adversely impacts the plaintiffs' recovery, no such concerns exist here. As such, the sound policy justifications counseling in favor of judicial reasonableness review of the attorney's fee portion of FLSA settlements are not implicated.[12]

At any rate, the record before the Court establishes that the proposed fee award to plaintiffs' counsel out of settlement proceeds is reasonable. In the Eleventh Circuit, it has long been the rule that "[a]ttorneys' fees awarded from a common fund shall be based upon a reasonable percentage of the fund established for the benefit of the class." *Faught v. American Home Shield Corp.*, 668 F.3d 1233, 1242 (11th Cir. 2011) (citations omitted). "Where the requested fee exceeds 25%, the court is instructed to apply the twelve *Johnson* factors,"

---

[11] As noted, there is a reversion feature in the Settlement Agreement pursuant to which excess/unclaimed settlement amounts in the Net Fund will revert to Cook Sales. By plaintiffs' calculations, nearly $150,000 of the settlement amount in that common fund will be returned to defendants by operation of this provision because more than 60% of Potential Opt-In Plaintiffs elected not to participate in the settlement or opt in to this litigation. Under these circumstances, sliding plaintiffs' counsel's fee award up or down by even large amounts would reduce or increase the total funds that revert to Cook Sales, but would not lower or raise the recovery of any Named Plaintiff, Original Opt-In Plaintiff, or Opt-In Plaintiff by even a penny.

[12] *See, e.g., Crabtree*, 2013 WL 593500, at *7 n.4 ("persuasive district court authority has deemed scrutiny of the reasonableness of plaintiff's agreed-upon attorney's fees to be unnecessary in an FLSA settlement where the plaintiff's attorneys' fee was agreed upon separately and without regard to the amount paid to the plaintiff, except in circumstances where the settlement does not appear reasonable on its face or there is reason to believe that the plaintiff's recovery was adversely affected by the amount of fees paid to his attorney") (citations and internal quotation marks omitted); *Bonetti*, 715 F. Supp.2d at 1228 (deeming scrutiny of reasonableness of attorney's fee payment in FLSA settlement unnecessary unless "the settlement does not appear reasonable on its face or there is reason to believe that the plaintiff's recovery was adversely affected by the amount of fees paid to his attorney"); *Wing v. Plann B Corp.*, 2012 WL 4746258, *4 (M.D. Fla. Sept. 17, 2012) (declining to assess reasonableness of attorney's fee payment in FLSA settlement where "Plaintiff's claims were resolved separately and apart from the issue of attorneys' fees," such that "there is no reason to believe that Plaintiff's recovery was adversely affected by the amount of fees and costs to be paid to Plaintiff's counsel").

including "(1) the time and labor required; (2) the difficulty of the issues; (3) the skill required; (4) the preclusion of other employment by the attorney because he accepted the case; (5) the customary fee in the community; (6) whether the fee is fixed or contingent; (7) time limitations imposed by the client or circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation, and ability of the attorneys; (10) the undesirability of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases." *Faught*, 668 F.3d at 1242-43 (citations omitted).

Here, as noted, plaintiffs' counsel seek a fee award of 30% of the Gross Fund. Under the circumstances of this case, the *Johnson* factors favor a finding of reasonableness. As to time and labor required, the Court observes that this complex collective action was settled only after more than eight months of litigation and mediation, during which time the attorneys spent an enormous amount of time and effort advocating legal theories, modeling potential damages, exchanging extensive documents and calculations, and engaging in detailed evaluation of defendants' compensation practices for sales representatives. (Smith Decl., ¶ 27.) Moreover, plaintiffs' counsel have presented evidence that their attorney's fees, costs and expenses calculated via the traditional lodestar analysis exceed the $148,500 fee request by a substantial margin. (Smith Supp. Decl., ¶ 7 & Exhs. 1 & 2.)[13] The record also chronicles the many factual and legal challenges faced by plaintiffs' counsel in litigating this matter, the overall difficulty of the issues, the vigorous manner in which Cook Sales defended itself against these claims, the skill required, the favorable results achieved, and the experience, reputation and ability of the attorneys. In addition, after judicial approval of the settlement, plaintiffs' counsel will continue to provide legal advice to plaintiffs regarding the terms of the settlement and will facilitate the execution of the settlement, including supervising the Settlement Claims Administrator in administering the payments to be distributed from the settlement and in preparing the appropriate tax forms. Finally, the notice provided to Potential Opt-In Plaintiffs explained that plaintiffs'

---

[13] In acknowledging such evidence, the Court does not expressly endorse or approve the accuracy of those calculations, the suitability of the billing rates used for the relevant legal market, or the propriety of particular time entries. For purposes of this Order, it suffices to recognize that plaintiffs' counsel's records reflect more than 600 hours of time expended by highly experienced lawyers, each of whom has decades of experience in similar matters, plus dozens of hours by other legal professionals, including data analysts and paralegals.

counsel would seek to recover 30% of the common fund as attorney's fees and costs. No Potential Opt-In Plaintiff objected to the percentage or amount of fees and costs sought by plaintiffs' counsel, and defendants expressly consented to same.

For all of these reasons, the Court is satisfied that the proposed attorney's fees sought by plaintiffs' counsel constitute adequate, reasonable compensation and that plaintiffs' recovery in this matter has been neither tainted nor otherwise adversely affected by the fee award negotiated and requested by their lawyers.

**IV.  Conclusion.**

For all of the foregoing reasons, it is **ordered** as follows:

1. The Consent Motion for Final Order Approving Settlement of Collective Action (doc. 57) is **granted**. The settlement of plaintiffs' FLSA claims is **approved** as fair and reasonable pursuant to the analysis required by the Eleventh Circuit in *Lynn's Food Stores, Inc. v. United States*, 679 F.2d 1350 (11th Cir. 1982). In accordance with the requirements of *Lynn's Food*, a stipulated final judgment will be entered;[14]

2. Within three business days after entry of this Order, defendants shall wire **$495,000.00** to a qualified settlement fund established by the Settlement Claims Administrator;

3. Within 14 days after entry of this Order, the Settlement Claims Administrator shall mail settlement checks to be paid pursuant to this Order and under the Settlement Agreement to all Named Plaintiffs, Original Opt-In Plaintiffs, and Opt-In Plaintiffs as identified on Exhibit E to the Declaration of Christina Francisco (doc. 59);

4. Within 14 days after entry of this Order, the Settlement Claims Administrator shall wire **$148,500.00** to plaintiffs' counsel as payment of plaintiffs' attorney's fees, costs and expenses;

---

[14] *See Nall*, 723 F.3d at 1308 ("The agreement between Nall and Malik was not made under the supervision of the Secretary of Labor, so ***it is valid only if the district court entered a 'stipulated judgment' approving it***.") (emphasis added).

5. Within 14 days after entry of this Order, the Settlement Claims Administrator shall be paid **$10,168.00** from the qualified settlement fund;

6. Within 14 days after entry of this Order, defendants shall pay the fees, costs and expenses of mediator Fern H. Singer;

7. Within 14 days after request by the Settlement Claims Administrator, defendants shall pay the employer's share of payroll taxes or contributions for the back pay portion of the payments made to Named Plaintiffs, Original Opt-In Plaintiffs, and Opt-In Plaintiffs;

8. Named Plaintiffs, Original Opt-In Plaintiffs, and Opt-In Plaintiffs shall have 120 days after the mailing of their settlement checks to cash or deposit them.  If any settlement check is returned as undeliverable, the Settlement Claims Administrator shall attempt to re-mail the check by contacting the particular plaintiff using information provided on his or her claim form.  Any amounts for checks not cashed or deposited within 120 days shall be paid by the Settlement Claims Administrator to Children's Hospital of Alabama as *cy pres*;

9. Any amounts remaining in the qualified settlement fund after disbursement of the above-described payments shall revert to defendants;

10. All Named Plaintiffs, Original Opt-In Plaintiffs, and Opt-In Plaintiffs who timely filed claims forms thereby and forever release, acquit and discharge all FLSA claims for minimum wage and overtime compensation accruing on or before December 22, 2015, that were or could have been asserted in this matter against Defendants and their subsidiaries, affiliates, business units, members, shareholders, and their predecessors and successors, officers, directors, agents, insurers, employees and assigns, including claims for back pay, penalties, interest, and liquidated damages, as well as all claims for attorney's fees, costs and expenses; and

11. This Court retains jurisdiction for the limited purpose of enforcing the terms of this Order.

DONE and ORDERED this 23rd day of January, 2017.

s/ WILLIAM H. STEELE
CHIEF UNITED STATES DISTRICT JUDGE